NOTICE

Decision filed 11/01/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220373-U

NOS. 5-22-0373, 5-22-0374 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* J.B. and L.B., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 19-JA-263 |
| v. | ) | No. 19-JA-264 |
| | ) | |
| Laura F., | ) | Honorable |
| | ) | Thomas E. Little, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the circuit court's judgment where the circuit court's findings that the respondent was an unfit person based upon its determination that the respondent failed to make reasonable progress for the return of the minor children during any nine-month period following the adjudication of neglect, and that termination of the respondent's parental rights was in the best interests of J.B. and L.B., were not against the manifest weight of the evidence.

¶ 2    The respondent, Laura F., is the natural mother of J.B., born March 12, 2013, and L.B., born March 26, 2014 (minor children). On June 14, 2022, the circuit court entered a judgment terminating the respondent's parental rights based upon its findings that the

respondent was an unfit person, and that termination of her parental rights was in the best interests of the minor children. The respondent appeals the circuit court's judgment, arguing that the State failed to prove that the respondent had not made reasonable progress towards the return of the minor children during the nine-month period following the adjudication of abuse or neglect. The respondent also argues that the circuit court erred in finding that the respondent had not made reasonable efforts to correct the conditions that were the basis for the removal of the minor children and erred in finding that the respondent had not maintained a reasonable degree of interest, concern, or responsibility as to the welfare of the minor children. Further, the respondent argues that the circuit court's finding that it was in the best interests of the minor children to terminate the parental rights of the respondent was against the manifest weight of the evidence. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                   I. BACKGROUND

¶ 4     On September 4, 2019, the State filed juvenile petitions[1] pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2018)). The petitions alleged that the respondent had mental health and substance abuse issues, and that the minor

---

[1]A juvenile petition was filed on behalf of J.B. in matter 19-JA-263 and on behalf of L.B. in matter 19-JA-264. The common law records do not contain a circuit court order consolidating the cases; however, the records indicate that the circuit court proceeded with the two separate cases as a single matter. Further, the majority of orders entered in these cases applied to both cases without separate findings concerning each minor. Therefore, we will refer to the filings on behalf of the minor children collectively without separately indicating to which minor child the filing applied unless the filings differ, or such clarification is needed for our analysis. This court, *sua sponte*, consolidated the appeals on June 21, 2022.

The juvenile petitions filed on behalf of the minor children were also filed against the minor children's natural father, but the termination of the natural father's parental rights is not at issue in this appeal. As such, this court has limited the summarization of the background information to that information related to the respondent and necessary to the issues raised on appeal.

2

children were dropped off by the school bus after school but that the respondent frequently was not home, and the minor children were returned to school. The petitions also alleged that when the Department of Children and Family Services (DCFS) went to investigate, J.B. was running into the street clothed only in a diaper and that J.B. suffered from autism spectrum disorder and had developmental delays.

¶ 5    As such, the juvenile petitions alleged that the minor children were neglected due to not receiving the proper care necessary for the minor children's well-being pursuant to section 2-3(1)(a) of the Act; being in an injurious environment pursuant to section 2-3(1)(b) of the Act; and having a parent or other person responsible for the minor children's welfare leaving them without supervision for an unreasonable time without regard for the mental or physical health, safety, or welfare of the minor children pursuant to section 2-3(1)(d) of the Act. *Id.* § 2-3(1)(a), (1)(b), (1)(d). The juvenile petitions further alleged that the minor children were abused as defined in section 2-3(2)(ii) of the Act, because a parent, family member, and/or a paramour of the minor children's parent created a substantial risk of physical injury by other than accidental means. *Id*. § 2-3(2)(ii).

¶ 6    The same day, a shelter care report and a parent-child visitation plan were filed on behalf of the minor children by DCFS. According to the report, on August 30, 2019, at 2 p.m., the respondent was not home to get the minor children off the school bus. The person reporting (reporter) the initial information to DCFS informed the agency that the bus had pulled away from the home and the reporter thought the minor children would be taken back to school. The reporter texted the respondent informing her that the minor

3

children were not dropped off at home. The reporter informed DCFS that the respondent was frequently either not at home or just did not answer the door when the minor children were dropped off. One such incident occurred when L.B. got off the bus and went into the home but the respondent was not there. During that incident, J.B. did not get off the bus and was taken back to school. The shelter care report also stated that the respondent suffered from mental health issues, including anxiety, depression, and bipolar disorder. Despite her mental health issues, the respondent reported that she took herself off of her medication and was "just smoking marijuana now." Further, the report stated that the respondent had anger issues and could be heard yelling at the minor children from inside the home. According to the reporter, the respondent met a man, Brandon, who was her sole focus and was very controlling. Further, the children were loud and aggressive. The minor children had gone without food, and the neighbors had cooperated to provide food for the family.

¶ 7     While investigating the case, the DCFS caseworker observed J.B. running out of the house and into the street wearing nothing but a diaper. A neighbor attempted to redirect J.B. onto the sidewalk and the DCFS caseworker followed the neighbor and J.B. to another neighbor's home where the respondent was sitting on the porch. The respondent became extremely irate and began yelling at the DCFS caseworker when she informed the respondent that she was from DCFS. When asked why J.B. was unattended, the respondent replied that she was just next door and that she had put the child down for a nap. The DCFS caseworker explained that the traffic was dangerous for the minor and informed the respondent why the situation had been reported. According to the

4

respondent, she was unable to get the minor children off the school bus because she had been at the plasma center donating and the center was very busy.

¶ 8    The shelter care report stated that the respondent's home was unclean and infested with roaches. The respondent reported that she had a roach problem for a while. The DCFS caseworker also observed the kitchen to be full of dirty dishes and the garbage to be overflowing. The respondent reported that she had not had time to clean. While the respondent was showing the DCFS caseworker around the house, J.B. had run out of the house and made it across the street without the respondent noticing. The respondent reported that J.B. had been diagnosed with autism and attention deficit hyperactivity disorder (ADHD) and took medication twice daily to treat his symptoms. The DCFS caseworker observed both minor children wearing diapers with the respondent stating that J.B. must wear them and that L.B. wears them because J.B. does. From a prior investigation, the DCFS caseworker learned that the respondent had a mental health diagnosis. The respondent reported that she saw a doctor every three months for medication management but that she had not taken her medications since May 2019 because she no longer needed them. According to the respondent, she smoked marijuana daily.

¶ 9    The DCFS caseworker then spoke with J.B.'s teacher who informed her that the respondent kept J.B. out of school for the entire last quarter of the school year due to the child's "fits." The teacher also stated that the respondent had reported that J.B. had been ill but that the school had determined that he had not been ill. According to the teacher, J.B. had an individualized education plan (IEP) due to his intellectual disability. The

teacher further informed the DCFS caseworker that the school received a call from the bus company stating that when they went to drop off J.B. at home, L.B. was observed on the porch crying and there was nobody home to let L.B. in the house. The bus had then taken both minor children back to school until the respondent could be reached. The teacher reported that when the respondent had been informed that the minor children were home alone, the respondent "did not seem concerned." As such, DCFS took protective custody of the minor children on August 30, 2019, and the minor children were placed in a traditional foster home that day.

¶ 10    The shelter care report noted the family's prior involvements with DCFS, stating that the family had a lengthy history with DCFS with two open cases in the past. The shelter care report recommended that the minor children should remain in the care of DCFS based on their young age, their inability to protect themselves, the respondent's untreated mental health issues, and the respondent's daily use of marijuana. Further, the shelter care report stated that the respondent did not provide adequate supervision for the minor children, which placed them in jeopardy of injury as well as the home being unclean and roach infested, again creating an injurious environment for the minor children.

¶ 11    On September 4, 2019, based upon the respondent's stipulation, the circuit court entered a temporary custody order granting temporary custody of the minor children to the Guardianship Administrator of DCFS. The circuit court also entered an order appointing a court appointed special advocate (CASA) for the minor children.

¶ 12    On October 7, 2019, the circuit court entered an adjudicatory order, noting that the respondent had been served with a summons but had not appeared in court. According to the adjudicatory order, the respondent's attorney was present but stated that he had not had any contact with the respondent. The circuit court found that the allegations of the petition were proven by a preponderance of the evidence based upon the respondent's mental health and substance abuse issues, and that the respondent was "defaulted" based on her failure to appear for the adjudicatory hearing.

¶ 13    The circuit court also entered a dispositional order on October 7, 2019. The dispositional order indicated that the circuit court found the respondent, for reasons other than financial circumstances alone, was unfit, unable, or unwilling to care for, protect, train, educate, supervise, or discipline the minor children and that placement with the respondent was contrary to the health, safety, and best interests of the minor children because of the respondent's ongoing mental health and substance abuse issues. The circuit court further found that reasonable efforts had been made to keep the minor children in the home, but the efforts had not eliminated the necessity for the removal of the minor children from the home. Based upon those findings, the circuit court found it to be in the best interests of the minor children to make them wards of the court and to grant custody and guardianship to DCFS. The circuit court's dispositional order also directed that the respondent would have supervised visitation and ordered her to cooperate fully and completely with DCFS; specifically, to comply with the terms of the service plan and to correct the conditions that required the minor children to be in care or risk the termination of her parental rights regarding the minor children.

¶ 14    On March 5, 2020, DCFS filed a permanency review report and the first service plan with the circuit court. The service plan was implemented on February 26, 2020, and required the respondent to engage in services including: (1) sign all necessary releases of information; (2) submit to a mental health assessment and follow all recommendations of the assessment; (3) complete domestic violence classes; (4) complete a substance abuse assessment and follow any recommendations; (5) cooperate with any urine or blood tests requested by service providers; (6) ensure appropriate parenting standards for her children; and (7) engage in parenting classes.

¶ 15    The permanency review report indicated that the respondent was referred for supervised two-hour visitation twice weekly and was provided with transportation assistance. According to the permanency review report, since October 24, 2019, the respondent had been inconsistent with attending the visits, missing at least two or three visits per month. The respondent was also referred for a substance abuse assessment; however, the respondent did not complete the assessment as required despite being given bus tokens for transportation to attend these services.

¶ 16    The permanency review report further indicated that the respondent was referred for a mental health assessment on November 9, 2019. The caseworker was informed that the respondent met with her counselor on January 24, 2020, to begin counseling services. On February 17, 2020, the caseworker was informed that the respondent did not appear for her appointments and that the counselor had made attempts to contact the respondent, but that she did not respond. The counselor informed the caseworker that she would

continue to reach out to the respondent in an effort to complete the mental health assessment.

¶ 17    The respondent was also referred to parenting education on December 17, 2019. On February 28, 2020, the respondent's parenting counselor reported that the respondent had missed her scheduled appointments the prior four weeks and was at risk of being dropped from the program. On March 4, 2020, the caseworker was informed that the respondent missed her appointment, and the parenting counselor would discuss this with her supervisor to determine a course of action due to the respondent's lack of attendance. The respondent was next referred for domestic violence classes but could not begin these services until she completed the parenting education classes. Lastly, the respondent was unemployed and reported that she was unable to actively look for employment due to her having health concerns. The respondent had not provided DCFS with any documentation to support her claims of suffering from health issues, but the respondent reported donating plasma daily to support herself. The permanency review report of March 5, 2020, recommended a permanency goal of return home within 12 months.

¶ 18    On March 13, 2020, CASA filed its initial report to the circuit court. The CASA report stated that J.B. was having behavior issues at school and received a call home at least two or three times per week due to his behaviors. According to CASA, their only concern was that J.B. was not receiving counseling at that time. As to L.B., the CASA report stated that she was in kindergarten and attended school for the first time. She was observed playing with another child in an extremely nice manner. She used the words "please" and "thank you" to the child while playing. L.B. loved to write and color.

According to CASA, they had no concerns with L.B. at that time. The CASA report further stated that the agency set up several meetings with the respondent and each of those resulted in the respondent not answering the door or her cell phone. According to CASA, they were concerned with the respondent's lack of engagement and involvement. The CASA report recommended a permanency goal of return home.

¶ 19 The circuit court entered an initial permanency order pursuant to section 2-28(2) of the Act on March 18, 2020. 705 ILCS 405/2-28(2) (West 2020). The respondent was not present in court. The circuit court considered the March 5, 2020, DCFS permanency review report and service plan, and found that the respondent had not made reasonable and substantial progress towards the return home of the minor children and had not made reasonable efforts toward returning the minor children home. The circuit court directed that the minor children remain in the custody of DCFS with a permanency goal of return home within 12 months, based upon the respondent's failure to engage in services.

¶ 20 On September 3, 2020, CASA filed its second report to the circuit court. The second CASA report stated that J.B. was an "incredibly happy seven-year-old boy that is a joy to talk to and be around." He liked watching cartoons and playing with toys. He had an IEP and was in special needs classes in school. He struggled with learning and his disability; however, these things did not prevent him from being able to engage in conversation with others. The second CASA report stated that J.B. was in a nice, clean home and a loving environment. According to CASA, they had no concerns regarding J.B. at that time.

10

¶ 21 The second CASA report also stated that L.B. was six years old, in first grade, and took joy in learning. She liked to read, count numbers, color, and play with J.B. She was a happy, smart girl who always made sure others around her were happy as well, especially J.B. Whenever J.B. was down, L.B. did whatever she could to lift him up. The second CASA report stated that L.B. was in a nice, clean home and a loving environment. According to CASA, they had no concerns regarding L.B. at that time.

¶ 22 The second CASA report then stated that CASA had not had any contact with the respondent. Initially, the respondent would make appointments to meet with CASA; however, she never kept the scheduled appointments. CASA had not been able to contact the respondent at all, even though the respondent was fully aware of CASA's involvement in the case. Further, the second CASA report stated the respondent was rated unsatisfactory by all agencies and had been taken off their lists, due to the respondent's noncompliance. According to the second CASA report, they were concerned with the respondent's lack of parental involvement. The second CASA report recommended the permanency goal be changed to substitute care pending determination on termination of parental rights.

¶ 23 On September 3, 2020, DCFS filed a second permanency review report with the circuit court. According to this second permanency report, on April 10, 2020, a child and family team meeting (CFTM) was held with DCFS, and all service providers involved in the case. The respondent was made aware of the CFTM meeting but did not engage in the meeting. The second permanency report indicated that during the CFTM meeting, it was reported that the respondent failed to complete her mental health evaluation, rescheduling

11

it on many occasions, and did not return telephone calls to complete it. It was further reported that the respondent only completed approximately two parenting education classes and had not been attending classes or returning telephone calls. The parenting education counselor had gone to the respondent's home on numerous occasions to meet with the respondent, but she did not answer the door. It was further reported that if the respondent wanted to reengage in services, she would need to reach out to the counselor to begin again. The visitation worker reported that the respondent usually attended visitation via video since COVID-19 prevented personal visitation. After the CFTM meeting, the DCFS caseworker contacted the respondent and informed her, via voicemail, that she should contact the caseworker about services.

¶ 24    According to the second permanency report, on June 26, 2020, a meeting between the visitation supervisor and the caregiver was held to discuss how in-person visitation would resume. It was concluded that in-person visitation would occur at DCFS's Danville, Illinois, office, twice weekly for two hours. On August 5, 2020, the caseworker spoke with the respondent, explaining that the respondent needed to reengage in services in order to be on track to achieve the goal of return home. At that time, the respondent stated that she would call and try to reengage; however, as of the preparation of the second permanency report, the respondent had not yet begun services. Further, the respondent had not completed her substance abuse assessment.

¶ 25    On September 9, 2020, the circuit court entered a second permanency order. The respondent was not present in court for the permanency hearing. The circuit court considered the September 3, 2020, DCFS second permanency report and the March 5,

12

2020, service plan. The second permanency order indicated that the circuit court had found that the respondent had not made reasonable and substantial progress nor reasonable efforts towards the return home of the minor children. The circuit court directed that the minor children remain in the custody of DCFS with a permanency goal of return home within 12 months.

¶ 26 On February 25, 2021, DCFS filed a third permanency hearing report and a second service plan with the circuit court. The second service plan indicated that the respondent was to engage in several services which were consistent with the first service plan. The third permanency hearing report noted that the caseworker had contacted the respondent's various service providers who all reported that, due to the respondent's lack of involvement, she would need to contact them to begin services again. The respondent was again referred for services, but had not engaged in services, stating that "she will follow up at later dates." The respondent also had not completed her substance abuse assessment. The third permanency hearing report noted that the respondent usually visited with the minor children twice weekly and that she was provided transportation for these visits. The DCFS caseworker reported that, at least once weekly, she would have face-to-face conversations with the respondent after the visits due to the respondent stating "her phone isn't working." During every conversation, the caseworker stated that she explained and encouraged the respondent to reengage in services in order to be on track to achieve reunification.

¶ 27 On February 25, 2021, CASA filed its third report to the circuit court. The third CASA report stated that L.B. was a happy and playful six-year-old in first grade. Overall,

13

L.B. was a "great kid that listens well and respects others." She was nice, polite, and a joy to be around. According to CASA, they had no concerns regarding L.B. at that time. The third CASA report stated that J.B. was seven years old, in the second grade, and had an IEP in place at school. Since J.B. attended a school that addressed his needs, he was getting assistance with his studies and, as a result, was doing quite well. J.B. loved to read books and spend time on his tablet listening to books. J.B. sung in the choir at church, which he attended regularly. According to CASA, they had no concerns regarding J.B. at that time.

¶ 28   The third CASA report indicated that the respondent had not answered or returned telephone calls to CASA. Further, CASA was concerned with the respondent's lack of contact with the agency and her lack of effort completing services. The third CASA report recommended a permanency goal of substitute care pending court determination of termination of parental rights.

¶ 29   On March 3, 2021, the circuit court entered a third permanency order. The respondent was present in court. The circuit court considered the February 25, 2021, DCFS third permanency hearing report, second service plan. The third permanency order indicated that the circuit court had found that respondent had not made reasonable and substantial progress nor reasonable efforts towards the return home of the minor children. The circuit court directed that the minor children remain in the custody of DCFS with a permanency goal of return home within 12 months.

¶ 30   On August 19, 2021, CASA filed its fourth report to the circuit court. The fourth CASA report indicated that J.B. communicated his wants and needs well and could hold

conversations. He had made progress with his speech due to the learning assistance he received due to his IEP. According to CASA, they had no concerns regarding J.B. at that time. The fourth CASA report stated that L.B. loved to read, color, and watch cartoons. Unfortunately, she was retained in school and would repeat first grade. According to her foster parent, virtual learning was a struggle for L.B. and played a large role in L.B.'s inability to master first grade because she "learns better, hand on." L.B. enjoyed helping her foster parent prepare meals and helped with grocery shopping. She played well with other children and, although they had little spats at times, enjoyed spending time with J.B. According to CASA, they had concerns with L.B. struggling academically at that time.

¶ 31 The fourth CASA report indicated that CASA had only one contact with the respondent since the last court date, even though the respondent was fully aware of CASA's involvement in the case. During that telephone call, CASA mentioned the respondent's failure to keep any of her scheduled appointments with the agency. The respondent began yelling that she had laundry to do and, "to her, that was more important than meeting to discuss progress made and her children." The fourth CASA report stated that CASA was aware that the respondent had missed several visits with the children and that CASA was informed by the DCFS caseworker that the respondent had failed to make reasonable progress on her service plan. The fourth CASA report further indicated that it was concerned with the respondent's lack of parental involvement and her failure to stay in contact with CASA. The fourth CASA report recommended a permanency goal of substitute care pending court determination on termination of parental rights.

15

¶ 32 On August 23, 2021, DCFS filed a fourth permanency hearing report and a third service plan with the circuit court. The third service plan indicated that the respondent was to engage in several services which were consistent with the first and second service plans. The family service plan rated the respondent as making unsatisfactory progress in all of her required services, including mental health, domestic violence, substance abuse, and parenting.

¶ 33 According to the fourth permanency report, during the reporting period, the respondent was again referred for services, including mental health, parenting, and substance abuse services, but she had not engaged in services since the case was opened. Further, the respondent did not attend the scheduled CFTM meeting on July 6, 2021, after previously stating that she would be available to attend. The respondent also needed to self-refer and engage in domestic violence services and had not done so. According to the fourth permanency hearing report, on July 6, 2021, a critical decision was made regarding the respondent's visitation due to her lack of consistency and her problematic behaviors during the visits. It was noted that the respondent would yell at the minor children during the visits. The respondent's visitation was reduced to one time per week, for two hours. If the respondent could show better consistency, increasing the visitations would be explored. The fourth permanency hearing report noted that assistance with obtaining appointments for self-referrals would be provided.

¶ 34 The fourth permanency report further stated that on August 20, 2021, the respondent reported that she had begun parenting classes and had obtained a mental health assessment in July 2021; however, the DCFS caseworker had not received any

16

information or documentation on these services. The DCFS caseworker again reported that she usually had conversations with the respondent after visits due to the respondent stating that her phone was not working. The caseworker reported that she spoke with the respondent at least once weekly and, during every contact, explained and encouraged the respondent to reengage in services in order to be on track to achieve reunification. According to the fourth permanency hearing report, the respondent stated that she would take steps to reengage in services. The respondent was not employed and reported she was not actively seeking employment due to her mental health concerns. She again reported donating plasma daily to support herself.

¶ 35    As to the minor children, J.B. was enrolled in third grade where he received additional support due to his IEP. L.B. was enrolled in first grade and appeared very healthy. It was reported that the foster parent signed a permanency commitment form, indicating a willingness to adopt the minors. The fourth permanency hearing report recommended a permanency goal of return home within 12 months.

¶ 36    On August 25, 2021, the circuit court entered a fourth permanency order. The respondent was present in court for the permanency hearing. The circuit court considered the August 23, 2021, DCFS fourth permanency review report and the August 19, 2021, fourth CASA report. The fourth permanency order indicated that the circuit court had found that the respondent had not made reasonable and substantial progress nor reasonable progress towards the return home of the minor children. The circuit court further noted there had been no progress or efforts by the respondent and changed the

permanency goal to substitute care pending determination of termination of parental rights.

¶ 37 On December 14, 2021, the State filed a motion seeking a finding of unfitness and permanent termination of the respondent's parental rights regarding the minor children. The State's motion alleged that the respondent was an unfit person as described within section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) and section 2-29 of the Act (705 ILCS 405/2-29 (West 2020)), as follows:

"A. Pursuant to 750 ILCS 50/1(D)(b), [the respondent] ha[s] failed to maintain a reasonable degree of interest, concern, or responsibility as the minor[ ] [children]'s welfare;

B. Pursuant to 750 ILCS 50/1(D)(m)(i) [the respondent] ha[s] failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor [children] from the parent during any 9 month period following the adjudication of neglect and/or abuse and or dependency under the Juvenile Court Act of 1987;

* * *

F. Pursuant to 750 ILCS 50/1(D)(m)(ii) [the respondent] has failed to make reasonable progress toward the return of the minor [children] to the parent during any 9 month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9 month period is: October 7, 2019 – July 7, 2020.

18

G. Pursuant to 750 ILCS 50/1(D)(m)(ii) [the respondent] has failed to make reasonable progress toward the return of the minor [children] to the parent during any 9 month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9 month period is: July 7, 2020 – April 7, 2021.

H. Pursuant to 750 ILCS 50/1(D)(m)(ii) [the respondent] has failed to make reasonable progress toward the return of the minor [children] to the parent during any 9 month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9 month period is: March 14, 2021 – December 14, 2021."

As such, the State requested that the respondent be adjudged an unfit person, that all of the respondent's parental rights and responsibilities to the minor children be terminated, and that DCFS be appointed guardian with authorization to consent to the adoption of the minor children.

¶ 38    On February 10, 2022, DCFS filed its fifth permanency review report with the circuit court and its fourth service plan. The fourth service plan indicated that the respondent was to engage in services which were consistent with the first and second service plans. The family service plan rated the respondent as making unsatisfactory progress in all of her required services, including mental health, domestic violence, substance abuse, and parenting.

¶ 39    The fifth permanency report noted that in October 2021, visits were moved to the respondent's home. It was further noted that the respondent engaged with the minor

children during visitation by playing with them and providing food as needed. The minor children appeared comfortable with the respondent and enjoyed the visits. The respondent had attended every visit and there were no concerns. However, the fifth permanency report noted that on February 1, 2022, the visits were reduced from once per week to twice monthly due to the respondent's lack of progress in services and the permanency goal change to substitute care pending determination on termination of parental rights.

¶ 40　　The fifth permanency report stated that the respondent lived with her boyfriend, Brandon, in Decatur, Illinois. Brandon and his daughter were involved in an open DCFS case where he could be the placement for his daughter. Brandon and his daughter were present during visits and the entire family seemed to get along. The respondent was unemployed, received SSDI benefits, and reported that she donated plasma regularly to support herself. She was referred on June 24, 2021, for parenting education and a mental health assessment. The respondent was currently engaged in individual therapy, and it was reported that "she has made a lot of progress, she attends her appointments, and that she has learned and utilized a lot of coping skills." She was also participating in individual parenting services. It was further noted that the respondent completed mental health and substance abuse assessments on January 27, 2022. She was not recommended for any substance abuse treatment but was referred to individual outpatient therapy. Lastly, the fifth permanency report noted that the respondent needed to engage in domestic violence classes and was referred for these services in June 2021. The fifth permanency review report recommended a permanency goal of substitute care pending court determination on termination of parental rights.

¶ 41   On February 18, 2022, CASA filed its fifth report to the circuit court. The fifth CASA report indicated that J.B. was an incredibly happy little boy who had put forth the effort to prove to himself and others that he could do anything he put his mind to. J.B. helped out in the home and enjoyed the meals provided by his foster parent. He was a great big brother to L.B. The fifth CASA report noted concerns with J.B.'s behaviors, since he had been hitting other children, both at home and at school. The foster parent had received several calls from the school regarding these behaviors. According to CASA, they were concerned with J.B.'s behavior issues at that time. The fifth CASA report stated that L.B. loved to read, color, and watch cartoons. L.B. enjoyed helping prepare meals in the home. She was doing well in school and was always focused on learning new things. Initially, school was a struggle for L.B., but she had made tremendous progress. She typically got along well with others and was very helpful when younger children were present. According to CASA, they had no concerns with L.B. at that time.

¶ 42   The fifth CASA report indicated that CASA had not had any contact with the respondent until a recent administrative case review (ACR), when the respondent stated that she did not know that CASA was on her case. According to the fifth CASA report, at the last court date, the circuit court instructed the respondent to stay in contact with CASA, and the next day, she contacted CASA making complaints about information provided in CASA's reports that, according to CASA, contradicted the respondent's claims. According to CASA, they were concerned with the respondent's failure to stay in

21

contact with the agency. The fifth CASA report recommended a permanency goal of substitute care pending court determination on termination of parental rights.

¶ 43   On February 24, 2022, the circuit court entered a fifth permanency order. The respondent was present in court. The fifth permanency order indicated that the circuit court had found that the respondent had not made reasonable and substantial progress nor reasonable efforts towards the return home of the minor children. The circuit court noted that the petition to terminate parental rights was pending and entered a permanency goal of substitute care pending determination of termination of parental rights, setting the matter for a permanency hearing.

¶ 44   On March 4, 2022, the DCFS caseworker filed an update to the fifth permanency report. The update was a report from the respondent's parenting educator, indicating an unsatisfactory rating for the respondent's parenting services. The caseworker noted that the respondent did complete an intake appointment for domestic violence services on March 2, 2022, and would be recommended for domestic violence education.

¶ 45   The circuit court conducted a fitness hearing April 28, 2022. At the fitness hearing, the circuit court heard testimony from Ally Dent. Dent testified that she was the DCFS caseworker involved in the case. She stated that service plans had been in place since the case began and that the service goals for the respondent were mental health treatment, substance abuse treatment, parenting training, and domestic violence counseling. Dent stated that referrals were made for all of those services, adding that more than one referral had been made, including four referrals for mental health services and three referrals for parenting services. One referral was made for substance abuse

services, but Dent noted that the respondent was informed that she could complete an assessment by walk in. Similarly, one referral was made for domestic violence services, but Dent again noted that the respondent was informed that she could self-refer to the program.

¶ 46    Dent testified that prior to December 14, 2021, the respondent had not successfully completed any of her service plan goals. Dent stated that there was nothing in the casefile indicating anything that would bar the respondent from completing her services. Dent further stated that she had spoken with the respondent in an attempt to get her moving forward in the services, noting that the respondent was willing to engage in the necessary services "at this point." Dent continued, stating that the respondent had informed Dent in the past that the respondent was not aware of the services she needed to complete, and that she did not have a good relationship with the prior caseworker. Dent could not testify whether the respondent had been provided the service plans. Dent did testify that between October 2019 through December 14, 2021, none of the respondent's four service goals were completed. Dent stated that she had multiple conversations with the respondent regarding what she needed to do since Dent became the caseworker in November 2021.

¶ 47    Dent further stated that when a referral for a service is made, the parent is made aware of it since a conversation would take place, the parent would need to sign consents, and the parent would be informed that the referral was being sent. When asked if there was any indication that the respondent was not understanding this process, Dent stated "no" and that sometime in 2021, the respondent called to begin parenting services, but that she never followed through with that. According to Dent, this evidenced that the

23

respondent knew she needed to complete services. Dent opined that, at that time, the respondent would not be ready to parent in a reasonable timeframe since none of her recommended services were completed. Dent stated that the respondent would need months to make sure the services were completed and to demonstrate the knowledge that she would learn.

¶ 48　On cross-examination, Dent admitted that she began working as the caseworker relatively recently, in November 2021, and that Erica Foster was the prior caseworker. Dent reiterated that she could not speak to whether or not the respondent was given a service plan by Erica Foster. Dent testified that the respondent requested a service plan, and she could not recall whether she provided one. Dent acknowledged that drug screening would typically be required if substance abuse services were needed, but that in the two years of this case, screening was not requested. Dent admitted this was unusual. Dent stated that the respondent was referred to substance abuse services. Dent was provided a report from the substance abuse provider that indicated that the respondent had completed a mental health and substance abuse assessment on January 27, 2021. According to the report, the respondent was recommended for individual outpatient therapy, but was not recommended for any substance abuse treatment. Dent acknowledged that she had not seen the report before and that if she had been the caseworker at the time, she would normally have received the report, and that on January 27, 2021, Erica Foster was the caseworker that should have received the report. Dent acknowledged that had she been the caseworker at that time and received the report, it would have indicated that the issue of substance abuse would have been addressed.

24

¶ 49    Dent continued her testimony by agreeing that the report would be the first step in addressing the respondent's mental health services, but it would not indicate that those services were fully addressed. Dent testified that the respondent did engage in the individual outpatient therapy and her attendance was good. Dent noted that while the respondent obtained a mental health assessment on January 27, 2021, the respondent engaged in counseling with a different service provider than the one preparing the assessment in July 2021.

¶ 50    Dent stated that she began working with DCFS in October 2021, that she had worked at a private child welfare agency prior to that, and that she was aware of the difficulties in engaging in services due to the COVID-19 pandemic. Dent acknowledged that she believed these difficulties would have affected the respondent's ability to engage in services. Dent then stated that she could not say how these difficulties affected the respondent but that "I know from other cases things pretty much shutdown for a couple months." Dent stated, however, that virtual services were implemented, but she had no knowledge regarding the respondent's ability to engage in virtual services. Dent agreed that the period of time the services were shut down and then were virtual would have been multiple months.

¶ 51    Dent then stated that the respondent engaged in parenting classes beginning in July 2021, but could not testify as to the respondent's attendance. Dent testified that the respondent's initial referrals for services were made around January 2020, after adjudication in the case in October 2019. Dent stated that would be a typical delay in making service referral. When asked if she knew the specific reasons why multiple

referrals were made regarding mental health and parenting services, Dent responded that this was due to the respondent's failure to engage in those services. Dent stated that during her involvement in this case, she did not experience any difficulty communicating with the respondent and that the respondent reached out to Dent somewhat regularly. Dent then stated that the referral for domestic violence services was made in December 2019.

¶ 52   When questioned by the guardian *ad litem* (GAL), Dent stated that as to the respondent's mental health and parenting services she began in July 2021, the respondent had not successfully completed those services. Dent further stated that the respondent was consistently visiting with the minor children.

¶ 53   On redirect examination, Dent stated that she had reviewed the permanency reports filed prior to her becoming the caseworker. Dent was referred to the third permanency hearing report of February 25, 2021, and its notation that, according to the respondent's mental health counselor, parenting education counselor, and visitation supervisor, the respondent would be required to call to begin services again due to her absent involvement, and that she was again referred for services on October 3, 2020. Dent acknowledged that she was familiar with that notation. Dent then acknowledged she was familiar with the fourth permanency hearing report of August 23, 2021, and its notations. Dent noted one notation was that referrals for mental health and parenting services were again made on June 24, 2021, and that the respondent had not engaged in any recommended services since the case was opened. Another notation was that a child family team meeting was scheduled for July 6, 2021, but that the respondent did not

attend. Another notation stated that the respondent needed to self-refer and engage in domestic violence counseling. Dent agreed that it was fair to say that, prior to at least August 2021, the respondent did not actively engage in services.

¶ 54 On recross-examination, Dent disagreed that every time the respondent was told she must self-refer for services that she did so. Dent gave an example, citing that the respondent was twice told by the prior caseworker, Erica Foster, and once by Dent to self-refer for domestic violence services. Dent did acknowledge that the respondent had self-referred for domestic violence and substance abuse services. Upon further questioning by the GAL, Dent clarified that the respondent self-referred for domestic violence services in December 2021 or January 2022, and that an assessment was completed. The assessment recommended that the respondent engage in a domestic violence course but that no substance abuse services were needed. Dent stated that the respondent had engaged in the domestic violence course shortly after completing the assessment and acknowledged that the assessment was completed shortly after the State's filing the motion to terminate parental rights.

¶ 55 The circuit court then heard testimony from Christine Foster, who testified that she was employed as a parenting educator at Webster Cantrell Youth Advocacy for 9 years and involved in social work for 14 years. She was familiar with the respondent, having received a referral for services around December 17, 2019. Foster stated that her first contact with the respondent was on January 29, 2020, when Foster set the respondent's regular appointments, with the first appointment scheduled for February 7, 2020. Foster stated that the respondent "no showed" for that appointment. Further, Foster stated that a

regular appointment was scheduled for February 14, 2020, but that the respondent "no showed" again. Foster continued, stating that she reached out to the respondent to confirm the next regular appointment on February 19, 2020, and that the respondent confirmed. Despite the confirmation, the respondent "no showed" on February 24, 2020, as well. After that missed appointment, Foster contacted the respondent, who apologized, stating that "she was at the hospital for cancer testing."

¶ 56 Foster continued by stating that in March 2020, the COVID-19 pandemic hit, and they were instructed to meet with people virtually. Foster testified that she attempted to contact the respondent on April 2, 2020, but got no response. Foster stated that she received a referral again in July 2021, and set an appointment with the respondent for July 19, 2021, at which the respondent did appear. Foster did an intake and parenting assessment, which indicated that the respondent was high risk in two areas. Accordingly, the respondent was recommended for the Illinois Nurturing Parenting curriculum. Foster stated that the curriculum is typically 34 sessions, but it is client paced. Foster then stated that after the sessions had begun, there were several complications that came up while doing the curriculum. Foster explained that, going back to July 2021, 28 appointments were offered and the respondent "no showed" for four and cancelled one due to court. Foster acknowledged that she had some cancellations, but it was difficult to reschedule those since the respondent wanted to keep her appointments on Wednesday mornings. According to Foster, these difficulties were not due to the respondent's work schedule since she was not employed, but rather, the respondent informed that she "just had other stuff, other appointments."

¶ 57 Foster continued, stating that, at the time that the petition for fitness was filed in December 2021, the respondent had not successfully completed the Nurturing Parenting curriculum. Foster explained that the curriculum is just step one and that, based upon the sessions she did have with the respondent, additional classes would continue after completing the Nurturing Parenting curriculum. This was based on the fact that the respondent did not get very far in the curriculum due to there being issues with the respondent's trouble understanding things that she read sometimes. Foster testified that it would take longer with the respondent because they would also need to review the material verbally. Foster also stated that the respondent did not complete the homework very often, causing the sessions to last longer. Foster further testified that the respondent's mental health issues contributed to the difficulties since Foster constantly had to redirect the respondent.

¶ 58 Due to the issues with the case, Foster stated that she encouraged the respondent to advocate for herself and reach out to her caseworker. Foster testified that she encouraged the respondent to engage in her mental health therapy and mentioned to Foster's supervisor that the respondent's mental health was an issue with parenting. Foster explained that the mental health issue sometimes triggered a person's past childhood experiences, and it caused a delay in the progression of the respondent's parenting services.

¶ 59 On cross-examination, Foster stated that the respondent ended on session 16 out of 34 of the Nurturing Parenting curriculum. According to Foster, the respondent would need to complete the remaining sessions of the current curriculum and then do the next

29

curriculum, called Protective Factors, which had a lot to do with the reasons the minor children came into care. Once completing the Nurturing Parenting and the Protective Factors curriculums, Foster would reassess the respondent to determine what her "scores would say." When questioned on how long this might take, Foster stated that it was up to the respondent and depended on if she was addressing her mental health issues and whether they could progress efficiently through the rest of the curriculum. Foster opined that it would take at least a year for the respondent to complete the entire curriculum.

¶ 60    When asked if Foster asked the respondent why she was unavailable for sessions, Foster replied that the respondent stated, "she had a lot going on" and "she had other appointments." When questioned if she asked the respondent what the nature of the appointments were, Foster stated that she encouraged the respondent to do her services and, therefore, assumed the respondent was doing services. When asked if the respondent had informed Foster that the respondent suffered from a learning disability, Foster stated that the respondent had informed her that she struggled with reading comprehension. Foster added that she gave the respondent blue vellum to put over the words to assist and suggested the respondent follow underneath the paper, and suggested she work with her boyfriend to read the materials. Further, Foster reiterated that she and the respondent did things verbally to help with the respondent's understanding. Foster also stated that Webster Cantrell Youth Advocacy would not assess for any type of learning disability.

¶ 61    The circuit court then heard testimony from Casandra Blockton Finley, who stated that she was employed as a mental health professional at Heritage Behavioral Health and as an advocate supervisor of the Macon County CASA. Blockton Finley stated that

30

CASA was assigned to this case on September 4, 2019. According to Blockton Finley, a prior CASA volunteer, Tiffany, was originally assigned to the case, but that Blockton Finley was assigned the case in December 2019. Blockton Finley stated that she had never assigned the case to another advocate due to the difficulties she had with contacting the respondent. Blockton Finley explained that when she took the case over, she reached out to the respondent on several occasions. Blockton Finley stated that the respondent would indicate that she had a number of other appointments. Blockton Finley continued, stating that she went to the respondent's home, but no one would answer. According to Blockton Finley, there was just no regular, consistent contact. Blockton Finley testified that every time she had contact with the respondent, the respondent had something else to do other than meeting with Blockton Finley to discuss the case and what was required.

¶ 62     On cross-examination, Blockton Finley stated that the respondent had regular contact with the prior CASA volunteer. Blockton Finley stated that she attempted to contact the respondent by telephone and in person and acknowledged that the respondent requested Blockton Finley communicate through email, and that the respondent provided an email address in January 2022. Blockton Finley testified that she and the respondent discussed the difficulties she was having contacting and communicating with the respondent. Further, according to Blockton Finley, she also discussed with the respondent that she needed to keep her scheduled appointments with Blockton Finley. When asked if the respondent had informed Blockton Finley of the reasons that contributed these difficulties, Blockton Finley stated that the respondent never told her specifically. Blockton Finley then testified that the respondent did contact CASA in October or

November 2021 and spoke with the executive director and the director. According to Blockton Finley, during that call, the respondent stated that "she was upset with the entire court system." Lastly, Blockton Finley stated that the first time she observed the respondent visiting with the minor children was on April 7, 2022.

¶ 63    On redirect-examination, Blockton Finley was questioned regarding a recent CASA report she authored. According to Blockton Finley, during an ACR meeting, the facilitator asked a question for CASA that Blockton Finley answered, and at that time, the respondent stated, "I didn't know CASA was assigned to my case." Blockton Finley continued, stating that the circuit court, on a couple of occasions in court, told the respondent to ensure that she stayed in contact with CASA, but at the ACR, the respondent argued that she did not know CASA was involved on the case. Blockton Finley continued, stating that the respondent was made aware of that because she had contact with a representative of CASA in 2019.

¶ 64    The respondent testified on her own behalf, stating that her original caseworker, Erica Foster, did not provide the respondent with a service plan. According to the respondent, although she requested a service plan, she never received one. The respondent stated that Erica Foster directed her to call "Youth Advocate" to begin her services. The respondent stated that she would call the office and that no one would answer, and she would leave voicemails asking who her service provider was, and who would be taking over her services. According to the respondent, no one would return her calls or get her services started. The respondent then testified that her services did not begin until she reached out to state representative Sue Scherer because nobody was

getting back to her or referring her to services. According to the respondent, the first time she was told she needed to do services was on July 16, 2021, when: "Um—I was told by her office attendant that um—my services would be starting at Youth Advocate with Christine Foster for parenting and Amy Muhlberg for counseling."

¶ 65    According to the respondent, until that time, she simply had not been given a place to go for services. When questioned how often she called the agency, the respondent stated: "Every other—every week or every other week I would, you know, give it time so somebody could return my call. I would then call, leave voicemails, nothing. I was then told that the reason nobody reached out to me was because nobody had a referral." The respondent stated that once she received the information on July 16, 2021, she attempted to engage in the recommended services. She stated that she was unable to engage in some services because "those would be the days where um—other appointments were scheduled um—within the time that, you know, I was suppose to be, you know, where I was—you know with my parenting or with counseling." The respondent explained that there were other appointments she tried to reschedule "because they were colliding with my services." The respondent stated that these appointments included going to appointments to address the respondent's degenerative disc disorder which she recently had disk removal surgery for in 2018, had four other discs causing her problems, and that she had numbness in her hands, arms, and right leg. According to the respondent, she had difficulty rescheduling those appointments.

¶ 66    The respondent further testified that she was first told where to go for domestic violence services after she reached out to Ally Dent in November and asked what other

services were needed. According to the respondent, she was told to reach out to a service provider for domestic violence counseling, which she then started. The respondent stated that prior to her conversation with Dent, the previous caseworker, Erica Foster, never told the respondent where to go for services, adding that "I had no rarely no communication with her or she would hang up on me." The respondent was then questioned regarding the previous testimony of Christine Foster that the respondent was referred to Foster for parenting classes in December 2019, with scheduled appearances for February 2020. In response, the respondent stated that in February 2020: "The only person I was aware of was Tiffany. I can't remember her last name. Um—I was then—I called the office one— an incident that happened with my children at one of my visits. I had reached out to her and I called the office. The lady told me that she wasn't my caseworker anymore and that it would have been switched. And I asked who that was and they told me they couldn't tell me."

¶ 67 The respondent then testified that she was diagnosed with dyslexia, a learning disability, when she was 13 years old and had an IEP. According to the respondent, she had difficulty progressing in her parenting classes because the disability caused her to bring lines together and that some of the letters collide together. She explained that "[i]t's hard for me to understand what someone is saying until it's shown. I have to be shown something um—visual is easier for me to understand than reading, or writing, or somebody talking to me."

¶ 68 On cross-examination, the respondent was asked if she recalled talking with either Tiffany or Ms. Foster in January 2020. In response, the respondent stated, "Um—they

were both communicating so, it was kind of hard for me to communicate with them. I heard her say that I could call the office to reach out to her. I then—at the time I had no minutes. I was using my Addus worker's phone to reach out that way she also had records of me reaching out to people. Because I—there was no communication." Further, the respondent stated that she was not given appointments for February 7 and 14, and did not receive a telephone call on February 19, 2020, from Foster.

¶ 69   Upon questioning by the GAL, the respondent acknowledged that she was present in court for the shelter care hearing on September 4, 2019. She also acknowledged that she did not appear for court on October 2, 2019, and March 18, 2020, stating, "I was not—no one told me about those dates." When asked about her not being present at the September 9, 2020, court date, the respondent stated, "Erica Foster never told me." The GAL then pointed out that the respondent was appointed an attorney, to which she responded, "I was, but nobody reached out to me." The GAL then asked the respondent how she knew to appear for the March 3, 2021, court appearance, to which she replied, "I had my caseworker. Um—I then had a letter sent to me. First letter ever sent to me that I had court." When questioned further by the GAL as to why, for nearly a year while the minor children were in care, the respondent failed to come to court to figure out the progress on the case, the respondent responded, "I wasn't aware of the court dates."

¶ 70   The circuit court then heard testimony from Lauren Henrichsmeyer, who testified that she was the parenting and children specialist at DOVE. She testified that she began working for DOVE in October 2017, and that from March 2020 through March 2022, there were problems and restrictions with people engaging in domestic violence services

35

at DOVE due to the COVID-19 pandemic. Henrichsmeyer stated that, during that timeframe, the services that were then being provided to the respondent were started and stopped five times. According to Henrichsmeyer, it would not have been possible for anyone to complete services during that timeframe because every time services were stopped, it would be two or three months "until cases calmed down." Regarding referrals, Henrichsmeyer explained that DOVE received referrals from other agencies, but that DOVE tells the agencies a referral is not needed, and the participant can "just come in and do our intake process and receive services." Henrichsmeyer further stated that DOVE had not received a referral or communications related to the respondent prior to March 2022.

¶ 71    On cross-examination, Henrichsmeyer was asked if DOVE received a referral for the respondent in December 2019, to which she replied: "No. We had no paper trail from her whatsoever." Upon questioning by the GAL, Henrichsmeyer confirmed that no referral through an agency was needed to begin services. She also reiterated that although services were stopped and started five times between March 2020 and March 2022, people could still self-report to DOVE to start services even though services may not have been completed during that timeframe. According to Henrichsmeyer, if a person started services during that timeframe and the services were stopped, the person could then appear once services were restarted. Henrichsmeyer then stated that she had no record of the respondent doing that on her own.

¶ 72    At the close of the fitness hearing, and after arguments by counsel, the circuit court gave its oral ruling on the record in open court. The circuit court reiterated the clear

and convincing standard the State was required to meet in the case. The circuit court began with the testimony of Ally Dent, the DCFS caseworker, who testified that referrals were made for the respondent as follows: four referrals for mental health services, one referral for substance abuse services, three referrals for parenting education, and one referral for domestic violence services. The circuit court then noted that self-reference for services was always a possibility. The circuit court noted Dent's testimony was that the respondent "was simply not engaged in her services." Further, the circuit court noted that in contradiction to the respondent's testimony that she did not know referrals were being made, Dent testified that consents needed to be signed before the referrals are made. Therefore, the circuit court stated that clearly the respondent would have consented to the referrals, thereby making her aware of the referrals.

¶ 73    The circuit court continued, noting that Dent testified that prior to the motion for fitness being filed on December 14, 2021, the respondent completed none of her service plan goals. Further, when questioned, Dent stated that between October 2019 through December 14, 2021, no goals were completed from the service plan. The circuit court summarized Dent's testimony as that the respondent "really never followed through with anything throughout the case," and found the testimony of Dent to be credible.

¶ 74    The circuit court then turned to the testimony of Christine Foster, the parenting educator for Webster Cantrell Youth Advocacy. The circuit court noted that Foster gave a "pretty detailed explanation" of the referrals that were made on behalf of the respondent, but that by December 2021, the respondent had not successfully completed the Nurturing Parenting Program. The circuit court stated that, based upon Foster's testimony, even if

the respondent had completed the Nurturing Parenting Program, there would be follow up classes that the respondent would be required to take. When questioned regarding how long that might take, Foster replied that it depended on the individual parent and the progress they were making. The circuit court noted that when asked if the respondent could safely parent the minor children, Foster's response was "no." Further, the circuit court referenced Foster's testimony regarding the second parenting program and the time necessary to complete it, noting Foster stating that even if fully engaged, it would take the respondent at least one more year to complete the parenting program. The circuit court found the testimony of Foster to be credible.

¶ 75   The circuit court then discussed the testimony of Casandra Blockton Finley, the CASA supervisor, who testified that she had no consistent contact with the respondent. The circuit court noted that Blockton Finley stated that the respondent had some contact with the prior CASA volunteer, but again reiterated Blockton Finley's testimony that she had no contact with the respondent. The circuit court found the testimony of Blockton Finley to be credible.

¶ 76   The circuit court then turned to the testimony of the respondent. It noted that the respondent claimed she did not know what she was supposed to do or where she was supposed to go. The circuit court found the respondent's testimony to be "completely incredible." It then held that the State had met its burden by clear and convincing evidence in demonstrating that the respondent was an unfit person for the reasons set forth in paragraphs 4 (a), (b), (g), and (h) of the State's motion seeking a finding of unfitness and the permanent termination of parental rights.

¶ 77 On May 19, 2022, DCFS filed its best interest report with the circuit court. We note that the best interest report contained in the record before this court does not include page two. Page two normally sets forth the reasons and circumstances as to why the minor children were taken into protective custody. Further, it appears from page three that a section of page two gives a narrative on the respondent's progress with her services, and this court does not have access to that information. However, from the provided pages, the respondent participated in some services at Webster Cantrell Youth Advocacy since July 2021. Further, the respondent was engaged in parenting classes, which she began in April 2022, as well as domestic violence classes, which she began in March 2022. The best interest report noted that the respondent completed a substance abuse assessment in January 2022, but was not recommended for treatment. According to the best interest report, the respondent had not completed any recommended services.

¶ 78 As to visitation, when the case was opened, the respondent was visiting with the minor children twice weekly for two hours with each visit being supervised. On July 6, 2021, a critical decision was made regarding the respondent's visitation due to her lack of consistency and her problematic behaviors during the visits. The best interest report noted that the respondent would yell at the minor children during the visits. The respondent's visitation was reduced to one time per week, for two hours. In October 2021, the respondent's visits were moved from the DCFS office to the respondent's home after a safety checklist was completed and the home was found to be appropriate. The respondent's visits remained once per week for two hours until February 1, 2022, when they were reduced to twice monthly for two hours. The visits were reduced due to the

39

respondent's lack of progress in services and because the goal was no longer to return home.

¶ 79    The best interest report stated that the minor children had resided within the same traditional foster home since August 31, 2019. The minor children were surrounded by a loving family who accepted them as their own. They had been attending the same church throughout the placement, where the foster parent felt a great sense of community. Further, the minor children's basic needs had been consistently met in the foster home and they were up to date on all medical appointments. The foster parent planned to facilitate continued contact between the minor children and the respondent through telephone calls and in-person visits, as long as it remains in the minor children's best interests.

¶ 80    The best interest report stated that the minor children refer to their foster parent as "grandma" and that they were both comfortable in the home and around the foster family. Both minor children were greatly loved and valued by the foster family and both children felt safe in the home and around the foster parent. The minor children had resided with the foster parent for almost three years and were comfortable with the foster parent and in the home and, according to the best interest report, it would be detrimental to move the minor children from the foster home where they had grown up for the past three years. J.B. was frequently seen hugging his foster parent and going to her for comfort, while L.B. sought out the foster parent for affection and comfort as needed.

¶ 81    The best interest report indicated that J.B. stated that he loved both the respondent and the foster parent, but that, while he missed the respondent and wanted to maintain a

relationship with her, J.B. was excited to live with his foster parent. As to L.B., it was reported that she also loved both the respondent and the foster parent, but that, although she would love to return to the respondent's care, L.B. stated that she understood that it was not safe at that time. Both children were involved in their community through their foster family and church and played with the other children in the neighborhood and church. The best interest report noted that the minor children were able to feel loved, accepted, and safe in the foster home, and that it was time for them to be out of the foster care system.

¶ 82    The best interest report indicated that the foster parent was willing to adopt the minor children. The foster parent was always supportive of the goal of return home but was excited to officially take the minor children as her own and raise them into successful young people. It further noted that although the respondent was currently participating in services, she failed to make substantial progress toward the goal of return home for the entirety of the three-year case. Meanwhile, the minor children had grown to feel loved and comfortable in the foster home and with the foster family. Further, the minor children had all their needs met in the foster home and had remained healthy and well cared for. The best interest report recommended that it was in the minor children's best interests to terminate the respondent's parental rights and for the permanency goal be changed to adoption.

¶ 83    The circuit court conducted the best interest hearing on June 14, 2022, at which the respondent was present. At the best interest hearing, the circuit court heard testimony from Ally Dent, the child welfare specialist with DCFS. She testified that she was

41

familiar with the minor children and that she prepared the best interest report, which she proofread, and no corrections or updates were needed. Dent testified that the minor children were placed together and doing really well in their foster home. Dent reported that the minor children had been in the foster home since the end of August 2019, and that the home was a potential adoptive placement for both minor children. Dent continued, stating the minor children did well in the home and in school, and also, that they were well supported by the foster parent and family. Dent reported that there are a lot of children in the foster family and that all of the children in the family get along well, other than sibling squabbles.

¶ 84 According to Dent, the minor children were socialized to the foster family and family events, as well as with school activities and social situations. Dent referenced J.B.'s IEP and that he had some medical issues he was being seen for. Further, the foster parent was very cooperative, willing, and able to take care of these issues by taking the minor children to doctor appointments for medical care. Dent stated that DCFS recommended that the respondent's parental rights be terminated and the permanency goal be changed to adoption.

¶ 85 On cross-examination, Dent acknowledged that the best interest report noted that the respondent had been engaged in domestic violence and parenting classes; however, Dent had no idea how long it would take the respondent to complete those classes. Dent also agreed that the respondent had been diligently pursuing the completion of the classes over the last several months. When asked if she had any concerns with the respondent as a parent that Dent did not believe the respondent was currently working on, Dent

responded: "She is currently involved in the recommended services." Dent clarified that her previous testimony regarding there being "a lot of children" was in reference to the foster parent's extended family, but that only the foster parent and the minor children live in the foster home. Dent reiterated that the minor children had resided in the foster home, exclusively, for approximately three years, and that J.B. was nine and L.B. was eight years old.

¶ 86   Dent further agreed that for the majority of the minor children's lives, they lived with and were raised by the respondent. Dent testified that the minor children refer to their foster parent as "Grandma," and that the minor children still refer to the respondent as "Mom." Dent stated that she had observed the respondent with the minor children and described the bond as "very close" and that they "enjoy spending time with one another." When asked if she believed the minor children would find it damaging or traumatic to be cut off from the respondent, Dent replied, "I think it will be traumatic, yes." Dent did add that she had talked with the foster parent about whether she would attempt to maintain the relationship between the minor children and the respondent, and that the foster parent was willing to maintain that relationship.

¶ 87   When questioned by the GAL, Dent reiterated that the minor children had integrated into the extended family of the foster parent. On redirect examination, Dent was questioned regarding the best interest report that stated that the minor children loved the respondent and their foster parent, and would like to return to the respondent's care, but the minor children understood it was not safe. Dent stated her belief was based on statements made by the minor children, particularly, that L.B. became upset when Dent

43

discussed adoption with L.B. According to Dent, she explained what the adoption meant and L.B. understood that she may not be able to go home with the respondent and would continue to live with Grandma.

¶ 88   On recross-examination, Dent testified that, with respect to the safety of the respondent's home, Dent observed the respondent's home in October or November 2021. Dent stated she had no concerns with the home, and it was "safe and suitable." When questioned what her safety concerns were about returning the minor children to the respondent's home, Dent stated: "The safety concerns that brought the children into care remain because [the respondent] has not completed services. But the home, in and of itself, is safe and not harmful to those that are living in it."

¶ 89   At the close of the best interest hearing, and after arguments of counsel, the circuit court gave its oral ruling on the record in open court. The circuit court stated that the State had the burden of proving, by a preponderance of the evidence, that it was in the best interests of the minor children to terminate the respondent's parental rights. The circuit court referenced the statutory best interest factors of section 1-3 of the Act. 705 ILCS 405/1-3 (West 2020). The circuit court stated it had considered each of the statutory factors and that the most significant, applicable factor in this case included the minor children's need for permanence where they feel a sense of security, familiarity, and continuity, including the need for stability and continuity of the relationship with parent figures.

¶ 90   The circuit court referenced the May 19, 2022, DCFS best interest report, noting that it went through the statutory factors essentially one by one, in detail, and that it was

44

very helpful to the circuit court. The circuit court stated the best interest report indicated that the minor children were placed together and had remained in the foster home since August 2019, where they were surrounded by a loving family who accepted the minor children as their own. The circuit court noted that the minor children attended church where the foster family felt a great sense of community, that the foster parent consistently met the minor children's basic needs, and that they were up to date on all their medical appointments and examinations.

¶ 91 Turning to J.B., the circuit court noted that the fact that he referred to the foster parent as "Grandma" demonstrated that he was comfortable in the foster home and with the foster family, who greatly loved and valued J.B. J.B. felt safe in the foster home where he had lived for close to three years, was frequently seen hugging his foster parent, goes to his foster parent for comfort, and it was "very clear that he feels comfortable around her." According to the best interest report, J.B. was excited about continuing to live with the foster parent. Further, J.B. was involved in the community through the foster parent and church and played with the children in the neighborhood. The circuit court referenced that the best interest report pointed out that J.B. needed to feel safe and secure in a permanent home, and that the foster parent was able to provide that to him. The circuit court noted that the minor children were placed together, and that J.B. was able to feel loved, accepted, and safe in the foster home.

¶ 92 Turning to L.B., the circuit court noted that she, too, referred to the foster parent as "Grandma" and was also comfortable in the foster home and with the foster family, who greatly loved and valued her. L.B. felt safe in the foster home where she had lived for

45

close to three years and sought out the foster parent for affection and comfort as needed. The circuit court continued, stating that it would be detrimental to move L.B. from the foster home because that is where she had "grown to be comfortable" and had stability for the past three years. The best interest report noted L.B.'s involvement in the community through the foster family and church, that she played with the other children in the neighborhood and at church, and that the foster home was a secure, safe, stable environment for L.B.

¶ 93    The circuit court then addressed the testimony of Dent, the child welfare specialist with DCFS, who testified that the best interest report was accurate, that the minor children were placed in the foster home since August 2019, and that it was an adoptive placement. The circuit court noted Dent's testimony that the minor children were doing well in school and were supported by the foster parent, foster family, and the extended foster family's children, who all were very accepting of the minor children. Further, the minor children were well socialized and engaged in activities at church and in school. Turning to Dent's testimony regarding the minor children's best interests, the circuit court noted that Dent plainly stated that it would be best to terminate the respondent's parental rights and free the minor children up for adoption so that they can have a stable, long-term, permanent placement. The circuit court found Dent's testimony to be very credible, consistent, and corroborative of the facts from the best interest report.

¶ 94    The circuit court found that the State had proven, by a preponderance of the evidence, that it was in the best interests of the minor children to terminate the respondent's parental rights. The circuit court then admonished the respondent regarding

her appeal rights. On the same day, June 14, 2022, the circuit court issued a written judgment as to parental fitness and permanent termination. In its written orders, the circuit court determined that the respondent was an unfit person based upon the following relevant findings:

"A. Pursuant to 750 ILCS 50/1(D)(b), [the respondent] ha[s] failed to maintain a reasonable degree of interest, concern, or responsibility as the minor[ ] [children's] welfare;

B. Pursuant to 750 ILCS 50/1(D)(m)(ii) [the respondent] ha[s] failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor [children] from the parent during any 9 month period following the adjudication of neglect and/or abuse and or dependency under the Juvenile Court Act of 1987;

* * *

F. Pursuant to 750 ILCS 50/1(D)(m)(ii) [the respondent] has failed to make reasonable progress toward the return of the minor [children] to the parent during any 9 month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9-month period is: October 7, 2019 – July 7, 2020;

G. Pursuant to 750 ILCS 50/1(D)(m)(ii) [the respondent] has failed to make reasonable progress toward the return of the minor [children] to the parent during any 9 month period following the adjudication of neglect

47

and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9-month period is: July 7, 2020 – April [7], 2021;

H. Pursuant to 750 ILCS 50/1(D)(m)(ii) [the respondent] has failed to make reasonable progress toward the return of the minor [children] to the parent during any 9 month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9-month period is: March 14, 2021 – December 14, 2021."

¶ 95    Further, the written orders included the circuit court's finding that it was in the best interests of the minor children and the public that all residual rights and responsibilities of the respondent be terminated. As such, the circuit court ordered the termination of the respondent's parental rights and responsibilities, and appointed DCFS as guardian of the minor children with authority to consent to the adoption of the minor children. The respondent filed her notice of appeal in the circuit court on June 15, 2022. The circuit court then entered a final permanency report on June 16, 2022, with the goal of adoption.

¶ 96    The respondent now appeals the circuit court's findings of unfitness and best interests, arguing that the findings were against the manifest weight of the evidence.

¶ 97                                    II. ANALYSIS

¶ 98                                    A. Parental Unfitness

¶ 99    "A parent's right to raise his or her biological child is a fundamental liberty interest, and the involuntary termination of such right is a drastic measure." *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 28. The Act (705 ILCS 405/1-1 *et seq.* (West 2020)),

48

along with the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)), governs the proceedings for the termination of parental rights. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). The Act provides a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re D.T.*, 212 Ill. 2d 347, 352-53 (2004). If the court finds the parent unfit, the State must then show that termination of parental rights would serve the child's best interests. *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 28.

¶ 100 In this appeal, the respondent argues that the circuit court erred in finding her an unfit person based upon its determination that she had not made reasonable progress toward the return of the minor children during any nine-month period following the adjudication of abuse or neglect. The respondent also argues that the circuit court erred in finding that the respondent had not made any reasonable efforts to correct the conditions that were the basis for the removal of the minor children and erred in finding that the respondent had not maintained a reasonable degree of interest, concern, or responsibility as to the welfare of the minor children.

¶ 101 We will focus on reasonable progress in this matter, as it is dispositive to the respondent's claim that the court erred in finding her unfit. The respondent argues that there is evidence of reasonable progress toward the return of the minor children, including the nine-month periods of October 7, 2019, to July 7, 2020, July 7, 2020, to April 7, 2021, and March 14, 2021, to December 14, 2021. The respondent argues that

49

she made reasonable progress despite not being given a service plan. According to the respondent, she completed mental health and substance abuse assessments in January 2021, which recommended individual outpatient therapy and no requirement for substance abuse counseling. The respondent argues that she engaged in mental health services and participated in parenting classes, beginning in July 2021. The respondent also argues she consistently visited with the minor children. According to the respondent, she did what was asked of her.

¶ 102  Section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)) provides for finding a parent unfit where the parent has failed to make reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect. *In re J.A.*, 316 Ill. App. 3d 553, 564 (2000). The State bears the burden of proving, by clear and convincing evidence, that the parent is unfit, and we may affirm if the evidence supports a finding of unfitness on any one of the alleged statutory grounds. *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶¶ 29, 39.

¶ 103 Reasonable progress is an objective standard that focuses upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. Measuring reasonable progress under section 1(D)(m)(ii) of the Adoption Act encompasses the parent's compliance with the service plans in light of the conditions giving rise to the removal of the minor children, while also considering other conditions which may later arise preventing the return of the children to the parent. *Id.* A parent's failure to substantially fulfill his or her obligations under the service plan is substantially a parent's failure to make reasonable progress

toward the return of the minor children. *Id.* "Reasonable progress requires, at minimum, measurable or demonstrable movement toward the goal of reunification." *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. Reasonable progress will be found when a trial judge concludes that the judge will be able to order the children returned to parental custody in the "near future." *Id*.

¶ 104 Further, a determination of parental unfitness involves factual findings and credibility assessments that the circuit court is in the best position to make, and a finding of unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re Tiffany M.*, 353 Ill. App. 3d 883, 889-90 (2004). "A factual finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the determination is unreasonable, arbitrary, and not based on the evidence." *Id*. at 890. Whether a parent has made reasonable progress may be examined in light of any nine-month period after the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)), and this court may affirm the circuit court's judgment on any basis established by the record (*In re K.B.*, 314 Ill. App. 3d 739, 751 (2000)).

¶ 105 In this matter, we find that the circuit court's finding that the respondent had not made reasonable progress toward the return of the minor children during any nine-month period following the adjudication of neglect is supported by the manifest weight of the evidence. Whether a parent has made reasonable progress may be examined in light of any nine-month period after the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)), and this court may affirm the circuit court's judgment on any basis established by the record (*In re K.B.*, 314 Ill. App. 3d at 751).

¶ 106 The respondent argues on appeal that she made reasonable progress despite not being given a service plan. The respondent cites her completion of a mental health and substance abuse assessment in January of 2021, which recommended individual outpatient therapy. The respondent points out that she participated in parenting classes beginning in July of 2021, was engaged in mental health services, and consistently visited with her children. While the respondent claims that she was not provided with a service plan, the circuit court found her testimony to be incredible. However, Ally Dent, the DCFS caseworker involved in the case, also testified that she was not certain whether the respondent was given a service plan. Further, the State did not present a witness to show that the respondent was ever provided with a service plan. The first service plan was initiated on February 26, 2020, and filed with the circuit court on March 5, 2020. The second service plan was initiated on February 5, 2021, and was filed with the circuit court on February 25, 2021. A third service plan was initiated on August 9, 2021, and filed with the circuit court on August 23, 2021. Each service plan included a space for the parents to sign, indicating that they had received a copy of the service plan and that the plan had been explained to them. Further, each service plan provided space for the parent to sign regarding the parent's understanding of the permanency goal. None of the service plans filed with the circuit court in this matter contained the respondent's signature, and the record is devoid of any evidence that the respondent received the three service plans filed in this matter. We note that a parent's signature in the requisite locations in the service plan form would foreclose any controversy over whether an individual received a service plan.

¶ 107 That acknowledgment aside, while we recognize that the service plans are an integral part of the statutory scheme, the overall focus in evaluating a parent's progress toward the return of the children shall remain, at all times, on the fitness of the parent in relation to the needs of the child. *In re C.N.*, 196 Ill. 2d 181, 216 (2001). The benchmark for measuring a parent's "progress toward the return of the child[ren]" under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the children, and in other conditions which later became known, and which would prevent the court from returning custody of the children to the parent. *Id*. at 216-17. The statute is clear that "[i]f a service plan has been established *** to correct the conditions that were the basis for the removal of the child[ren] from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child[ren] to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child[ren] into care." 750 ILCS 50/1(D)(m) (West 2020).

¶ 108 Regardless of the provision of the service plans to the respondent, under the facts of this case, the evidence clearly established that the respondent was made aware of the services that were required and failed to complete the service plan during any nine-month period following the adjudication of neglect. The first nine-month period in this case was from the date the adjudication orders were signed, October 7, 2019, to July 7, 2020. Referrals for services were made between November 2019 and January 2020. Christine Foster, parenting educator at Webster Cantrell Youth Advocacy, received a referral for

the respondent to engage in parenting education classes on December 17, 2019, and made her first contact with the respondent on January 29, 2020. Foster and the respondent scheduled regular appointments in February 2020, but the respondent failed to appear for the appointments on February 7 and 14, 2020. Further, Foster contacted the respondent and confirmed the next appointment on February 18, 2020. Despite the confirmation, the respondent failed to appear for the next scheduled appointment on February 24, 2020. After that missed appointment, Foster contacted the respondent, who apologized for missing the appointment. The respondent failed to begin or complete her parenting education classes during the first nine-month period. At the fitness hearing, the respondent denied Foster scheduled these appointments; however, the circuit court found Foster's testimony to be credible and the respondent's testimony "completely incredible." The respondent failed to obtain the mental health and substance abuse assessments or otherwise engage in services during the first nine-month period.

¶ 109 The second nine-month period in this case was from July 7, 2020, to April 7, 2021. On January 27, 2021, the respondent did obtain mental health and substance abuse assessments. No substance abuse services were recommended, but the respondent was recommended for mental health counseling on an individual outpatient basis. The respondent, however, failed to engage in these services during the second nine-month period, only engaging in counseling in July 2021. Again, the respondent failed to engage in any recommended services during the second nine-month period.

¶ 110 The final nine-month period in this case was from March 14, 2021, to December 14, 2021, the date the motion for termination was filed. During this period, the

54

respondent did engage in the "Nurturing Parenting" curriculum with Christine Foster. As of December 14, 2021, however, the respondent needed to complete 16 more classes of that curriculum as well as the entire "Protective Factors" curriculum. According to Foster, it would take at least one year for the respondent to complete both curriculums. The respondent argues that she suffers from the learning disability dyslexia, and that this made it difficult for her to complete the parenting services. Foster testified, however, that when the respondent informed her that she struggled to understand reading, Foster suggested that the respondent's boyfriend help with the reading. Foster also stated that she gave the respondent blue vellum to put over the words to assist her and suggested the respondent follow underneath the paper. Further, Foster testified that she and the respondent reviewed materials verbally to help with the respondent's understanding.

¶ 111 The respondent was also engaged in mental health services during the final nine-month period. The respondent, however, did not actively engage in any of the recommended services until July or August 2021, and failed to complete any of her recommended services within this final nine-month period. Although the respondent did engage in domestic violence services, this was only in March 2022, long after the petition for termination was filed. The testimony at the fitness hearing was clear that the circuit court was not close to being able to return the minor children home in the near future.

¶ 112 The respondent also argues on appeal that she consistently attended her visits with the minor children. Although this may be true, the testimony presented at the fitness hearing was that on July 6, 2021, the respondent's visitation was reduced to once weekly due to her lack of consistency and her problematic behaviors during the visits. It was

noted that in October 2021, visits were moved to the respondent's home, that the respondent engaged with the minor children during visitation by playing with them and providing food as needed, and that the minor children appeared comfortable with the respondent and enjoyed the visits. The respondent's arguments on appeal are not supported by the various reports submitted to the circuit court and the testimony at the circuit court's fitness hearing. As stated above, the circuit court was in the best position to make a credibility assessment of the respondent's testimony, along with the testimonies of the respondent's caseworkers and providers. Further, as noted above, reasonable progress is an objective standard that focuses upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. In this matter, the respondent was permitted over two years from the time the minor children were taken into DCFS's care to complete her service plan and failed to do so. At the end of the lengthy period of time that the minor children were in care, the circuit court was no closer to being able to conclude that the children would be returned to parental custody in the near future.

¶ 113 Therefore, we find that the circuit court's finding that the respondent was an unfit person as defined in section 1(D)(m)(ii) of the Adoption Act, based on the respondent's failure to make reasonable progress toward the return of the minor children during any nine-month period following the adjudication of neglect, was not contrary to the manifest weight of the evidence. As noted above, only one count of unfitness needed to be proven for the circuit court to find that the respondent was an unfit person. *In re J.A.*, 316 Ill. App. 3d at 564. Because we have determined that the circuit court's finding that the

respondent was an unfit person for failing to make reasonable progress toward the return of the minor children during any nine-month period following the adjudication of neglect, we do not need to address the respondent's remaining issues relating to parental unfitness.

¶ 114                                   B. Best Interest Determination

¶ 115 After a circuit court enters an order finding a parent unfit, it must determine whether termination of parental rights is in the minor children's best interests. *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 41. Section 1-3(4.05) of the Adoption Act (705 ILCS 405/1-3(4.05) (West 2020)) sets forth the various factors for the circuit court to consider in assessing children's best interests. *Id.*

¶ 116 In determining the best interests of the children, the circuit court must consider the following statutory factors within the context of the children's age and developmental needs: (1) the children's physical safety and welfare; (2) the development of the children's identities; (3) the children's background and ties; (4) the children's sense of attachments, including where the children feel love, attachment, and a sense of being valued, the children's sense of security, the children's sense of familiarity, the continuity of affection for the children, and the least disruptive placement alternative for the children; (5) the children's wishes and long-term goals; (6) the children's community ties; (7) the children's need for permanence, which includes a need for stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and the children; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the children. *In re Daphnie E.*,

57

368 Ill. App. 3d 1052, 1072 (2006); see also 705 ILCS 405/1-3(4.05) (West 2020). While all of the above factors must be considered, no one factor is dispositive. *In re K.C.*, 2022 IL App (5th) 220312-U, ¶ 34. Other important factors include the nature and length of the children's present caretaker and the effect that a change of placement would have upon the emotional and psychological well-being of the child. *Id.*

¶ 117 The State bears the burden of proving, by a preponderance of the evidence, that termination is in the best interests of the minor children. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009). A circuit court's best interests finding will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Id.* A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Id.* The circuit court is not required to make specific findings of fact concerning the best interest factors as long as there is some indication in the record that it considered the enumerated factors when making the best interest determination. *In re Marriage of Stribling*, 219 Ill. App. 3d 105, 107 (1991). In this matter, after carefully reviewing the record and in light of the best interest factors that must be considered, we do not find that the circuit court's determination to terminate the respondent's parental rights was against the manifest weight of the evidence.

¶ 118 The respondent argues that she had engaged in domestic violence and parenting classes during the months prior to the best interest hearing. She further argues that the bond between the minor children and her is very strong and that it would be traumatic for the minor children to be cut off from the respondent. The respondent argues that when DCFS observed the respondent's residence, no concerns were found, and it was deemed

safe and suitable. The respondent finally argues that it is in the best interests of the minor children that they grow up with the mother that loves them and has fought for them. We disagree.

¶ 119 The circuit court made an extensive record regarding its consideration of the children's best interest factors as set forth above. The circuit court reviewed the best interest report and heard the testimony regarding the love and bond the minor children shared with their foster parent and extended foster family, with the minor children referring to their foster parent as "Grandma." The circuit court also heard the testimony that the minor children were placed together in the foster home since August 2019, and how well they were doing in the home and at school. The circuit court heard testimony of how the minor children were supported and loved by the foster parent and family, and that the minor children got along well with the other children in the extended family. The minor children attended church with the foster family, felt a great sense of community in their placement, and were well socialized and engaged in activities in the neighborhood, at church, and in school. The foster parent consistently met the minor children's basic needs, and they were up to date on all their medical appointments and examinations. The circuit court heard testimony regarding the minor children's current home, stability, and permanency. The circuit court referenced the minor children feeling safe in the foster home.

¶ 120 The respondent's home was deemed "safe" in October or November 2021, by DCFS, and Ally Dent testified that she had no concerns with the home, and that it was "safe and suitable." However, when questioned what her safety concerns were about

returning the minor children to the respondent's home, Dent stated: "The safety concerns that brought the children into care remain because [the respondent] has not completed services. But the home, in and of itself, is safe and not harmful to those that are living in it." The circuit court noted Dent's testimony that she plainly stated that it would be best to terminate the respondent's parental rights and free the children up to adoption so that they can have a stable, long-term permanent placement.

¶ 121 Addressing the respondent's argument regarding the strong bond between her and the minor children, and that it would be traumatic for them to be cut off from the respondent, Dent testified that the respondent and minor children were very close and enjoyed spending time together. Dent further stated that she believed it would be traumatic for the minor children to be cut off from the respondent. However, Dent went on to state that she discussed this with the foster parent, and that the foster parent was willing to maintain the relationship between the minor children and the respondent. Further, Dent testified that she spoke with the minor children regarding the adoption and, although L.B. was upset, they both understood that the respondent's home was not safe and that they might not be able to return home to the respondent.

¶ 122 The circuit court, having observed the witnesses and heard the testimony, is in a better position to weigh this evidence. *In re Julian K.,* 2012 IL App (1st) 112841, ¶ 66. The respondent does not allege, nor does the record indicate, that the circuit court failed to consider the enumerated factors when making the best interests determination. The circuit court evaluated the testimony related to the above considerations and found that

they did not outweigh the evidence in favor of termination by a preponderance of the evidence.

¶ 123 Based on the above analysis, we find that the circuit court's judgment that termination of the respondent's parental rights was in the minor children's best interests was not contrary to the manifest weight of the evidence.

¶ 124                                    III. CONCLUSION

¶ 125 Based on the above, we find that the circuit court's judgment that the respondent was an unfit person based upon its determination that the respondent failed to make reasonable progress for the return of the minor children during any nine-month period following the adjudication of neglect, and that it was in the best interests of the minor children to terminate the respondent's parental rights, was not contrary to the manifest weight of the evidence. Therefore, we affirm the judgment of the circuit court terminating the respondent's parental rights regarding the minor children.

¶ 126  Affirmed.